UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MICHAEL DENTON, | CASE NO. C19-5743 BHS |
| Plaintiff, | ORDER |
| v. | |
| KARIE RAINER, et al., | |
| Defendants. | |

This matter is before the Court on Defendants Kevin Bowen, Sean Murphy, Michael Obenland, Karie Rainer, Cheryl Strange, and Timothy Thrasher's Motion for Summary Judgment, Dkt. 248.

## I.   FACTUAL BACKGROUND

Plaintiff Michael Denton is currently incarcerated by the Washington Department of Corrections ("DOC") at Washington State Penitentiary ("WSP") in Walla Walla, Washington. Denton was first incarcerated in a Washington DOC facility in 2006 for a crime unrelated to his current confinement. Upon entering DOC custody in 2006, Denton was immediately assigned to maximum ("Max") custody. He spent his entire first

incarceration, from 2006 to 2013, in either a Restrictive Housing Unit ("RHU") or in a Close Observation Area ("COA").

In 2015, Denton was arrested and placed back in Pierce County Jail for a parole violation. He was held at the jail awaiting trial for custodial assault charges and was ultimately convicted and sentenced to twelve years in prison. Denton was held in isolation at the Pierce County Jail and upon his return to DOC custody in June 2017, he was again at his request immediately placed into Max custody. Denton remained in various types of restricted custody until his release into a close custody unit, Baker Unit,[1] at WSP in March 2023. Denton has never entered general population while in DOC custody.

Max custody is DOC's highest classification level. Dkt. 248 at 2. According to DOC, "[i]ndividuals are housed on Max custody when they pose a significant risk to the safety and security of employees, contract staff, volunteers, and other individuals based on (1) commission of violent serious infractions; (2) chronic behavioral/infraction problems; (3) acts that present a significant risk; and/or (4) validated protection needs." *Id.* at 2–3. Max custody inmates' status is formally reviewed every 180 days and informally reviewed every 60 days.[2] *Id.* at 3.

---

[1] Baker is one of three units at WSP referred to as the "BAR" Units, which consist of Baker, Adams, and Rainier Units. Baker and Rainier are close custody units, while Adams is a medium custody unit. These are less restrictive than the Intensive Management Unit ("IMU") which is classified as Max custody.

[2] Denton does not acknowledge this 60-day informal review. It is unclear whether he disagrees that they take place or disagrees that such review is "meaningful."

1    DOC develops a Behavior and Programming Plan ("BPP") for Max custody

2    inmates, which "sets forth programming expectations and behaviors that an inmate

3    should or should not engage in." *Id.* DOC sometimes also develops an Individual

4    Behavior Management Plan ("IBMP") for Max custody inmates, which "set[s] forth clear

5    expectations of behavior by the inmate and consistent and appropriate responses by staff

6    to both good and bad behavior." *Id.*

7    Max custody inmates participate in a Level/Step program where they can progress

8    from Level 1 to Level 3[3] if they exhibit good behavior. *Id.* The inmate must be at Level 1

9    for a minimum of 30 days before progressing to Level 2, and at Level 2 for a minimum of

10   30 days before progressing to Level 3. *Id.* When an inmate moves up a level, he is

11   afforded additional privileges such as a radio or a television. Dkt. 155, ¶ 19. At the

12   highest level, the inmate is let out of his cell with other inmates for four hours a day. *Id.*

13   If an inmate receives infractions, he is demoted to a lower level. *Id.* ¶ 20. An inmate must

14   successfully progress through all the levels to be released from Max custody. *Id.*

15   Max custody inmates also have access to medical and mental health care and, in

16   some facilities, programming, but DOC acknowledges that "the restrictions are inevitably

17   more severe than general population units." Dkt. 248 at 3.

18   Denton characterizes his continued placement in Max custody as solitary

19   confinement and asserts that he had been held in isolation for his entire incarceration until

20

21        [3] DOC's level system had four levels at the start of this case but it now has only three.
     Dkt. 248 at 3 n.3. Denton's complaint refers to four levels, but the general facts regarding the
22   level system remain accurate.

1  March 2023. Dkt. 155, ¶ 15. The DOC disputes this characterization. It asserts that

2  Denton spent time in the Special Offender Unit ("SOU") and the Close Observation Unit

3  ("COA"), which it apparently does not consider to be solitary confinement. *See, e.g.*, Dkt.

4  162, ¶ 15.

5      Regardless of the parties' disagreement and whether the SOU and the COA are

6  fairly considered solitary confinement, it is indisputable that Denton has spent, by far,

7  most of the time in isolation.

8      The parties also disagree about the severity and cause of Denton's mental health

9  issues. DOC asserts that Denton engages in some level of malingering,[4] and has control

10  over his behavior. *See, e.g.*, Dkt. 248 at 14–15 ("[W]hen Denton believes it is

11  advantageous to him, he acts out and lashes out toward staff."). Denton argues that his

12  time spent in solitary has significantly worsened (and continues to magnify) his mental

13  health such that he is often unable to control his behavior, and he disputes that he is

14  malingering. *See generally* Dkt. 259.

15                          **II.   PROCEDURAL BACKGROUND**

16      Denton filed four related lawsuits, including this case, between 2017 and 2020.

17  *See Denton v. Pastor*, 17-cv-5075 BHS; *Denton v. Thrasher*, 18-cv-5017 BHS; *Denton v.*

18  *Thrasher*, 20-cv-5968 BHS. Each challenged, in some capacity, his long-term

19  _____

20      [4] Notably, while DOC continuously disputes the severity of Denton's mental health
    problems, its placement of him in the SOU suggests that it recognizes his severe mental health
21  struggles. DOC classifies the SOU as being reserved "to treat/house the many Seriously Mentally
    Ill (SMI) incarcerated individuals needing a residential level of care." *See* Department of
    Corrections, *Monroe Correctional Complex (MCC)* (last visited Aug. 2, 2023),
22  https://www.doc.wa.gov/corrections/incarceration/prisons/mcc.htm.

incarceration in solitary confinement. The other three suits have been resolved and only this one remains. None of Denton's previously resolved federal lawsuits substantively addressed his claims that DOC's practices involving solitary confinement, both on their face and as applied to him, are unconstitutional.

In this case, Denton initially sued nineteen DOC employee defendants while proceeding pro se in 2019. Dkt. 10. He simultaneously moved for a temporary restraining order ("TRO"), Dkt. 11, which the Court denied, Dkt. 36, adopting the report and recommendation ("R&R") of Magistrate Judge Theresa L. Fricke, Dkt. 14. Shortly after that denial, Denton again moved for a TRO, Dkt. 38, and for the appointment of counsel, Dkt. 40. Before those motions were resolved, Denton retained counsel, Dkt. 42, and withdrew his TRO motion, Dkt. 52, agreeing that it was moot given his transfer from WSP to SCCC.

Denton filed his first motion for a preliminary injunction in May 2021. Dkt. 59. After oral argument, Dkt. 66, Judge Fricke recommended this Court grant Denton's motion, Dkt. 67. The Court declined to adopt Judge Fricke's R&R, concluding the briefing was insufficient to rule on the motion. Dkt. 78. It ordered the parties to file additional briefing regarding inconsistencies of the relief requested in Denton's complaint and his TRO, and potential mootness issues. *Id.*

While Denton's preliminary injunction motion was pending, Defendants moved to exclude the testimony of Denton's expert, Dr. Anthony Eusanio, Dkt. 76, and for summary judgment, Dkt. 89.

1    In November 2021, after the parties submitted supplemental briefing, Judge Fricke

2    heard oral argument on all three motions. Dkt. 96. She denied the motions as premature

3    and granted Denton leave to amend his complaint. *Id.*; *see also* Dkt. 97. Denton filed an

4    amended complaint in which he added and removed claims and defendants. Dkt. 98.

5    Defendants objected to Judge Fricke's order, arguing that Denton never properly moved

6    to amend and that they therefore did not have an opportunity to review his amended

7    complaint prior to Judge Fricke's order, nor did they have a meaningful opportunity to

8    oppose the motion. Dkt. 100. They argued that the amended complaint was improper

9    because of the major changes it made to both claims and defendants, years into this case.

10   *Id.* Defendants Rainer and Russell also moved to dismiss Denton's complaint. Dkt. 103.

11       In March 2022, the Court agreed that Judge Fricke's order granting Denton leave

12   to amend his complaint was improper and overruled that order. Dkt. 115. Denton then

13   moved to amend his complaint, again seeking to significantly change the claims and

14   defendants. Dkt. 118. Judge Fricke recommended denying the motion because of those

15   significant changes. Dkt. 148. This Court declined to adopt that R&R and granted

16   Denton's motion to amend, but it ordered Denton to follow specific guidelines in drafting

17   and filing his amended complaint. Dkt. 151. He did so, and that amended complaint

18   remains the operative complaint in this case. *See* Dkt. 155.

19       In May 2022, Defendants again moved to exclude Denton's expert, Dr. Eusanio.

20   Dkt. 142. Judge Fricke denied that motion, and all other pending motions, as moot

21   because they were directed toward Denton's previous complaint. Dkt. 157. In October

22

1   2022, Denton voluntarily dismissed seventeen defendants. Dkt. 158. Since that time,

2   Denton has asserted three claims against six defendants.[5] *See id.*

3        In November 2022, Denton moved, again, for a preliminary injunction, Dkt. 163,

4   and Defendants again moved to exclude Denton's expert, Dr. Eusanio, Dkt. 166. The

5   Court denied Defendants' motion to exclude, Dkt. 177, and held a two-day evidentiary

6   hearing on Denton's preliminary injunction motion, Dkts. 204, 205. Ultimately, the Court

7   reserved ruling on Denton's motion given DOC's assurances that it was working on a

8   plan to transfer Denton out of solitary and into the BAR Units. Dkts. 205, 206. It also

9   ordered the parties to procure an independent mental health evaluation of Denton. Denton

10  also moved to exclude the testimony of Defendants' expert witness, Dr. Ryan Quirk, at

11  trial. Dkt. 202.

12       In March 2023, the Court held a status conference during which the parties

13  discussed DOC's plan to move Denton out of solitary and the status of the updated

14  mental health evaluation. Dkt. 223. The Court also ordered the parties to provide

15  supplemental briefing on Denton's motion to exclude. *Id.* Denton was released into Baker

16  Unit in April 2023 and the parties' agreed mental health examiner, Dr. Nathan Henry,

17  evaluated Denton. *See* Dkt. 237. He filed his report with the Court under seal at Dkt. 242.

18

19

---

20       [5] Although Defendants do not raise this as an issue, it remains unclear to the Court
    whether Denton has ever named the correct defendant in this case. While some of his requested
21  relief likely could be carried out by the named defendants, it is not clear to the Court that anyone
    but the director of the DOC would have the authority to change DOC policy, which has been a
22  main focus of this case.

1  Given Denton's release from solitary, the Court denied his preliminary injunction motion

2  as moot. Dkt. 243.

3       In mid-May 2023, Denton received several infractions, including for threatening to

4  harm staff and for engaging in sexual harassment of a staff member. Dkt. 246.

5  Defendants informed the Court that Denton had been returned to the IMU and stated that

6  "Department staff [would] be evaluating Denton's placement." *Id.* at 3–4.

7       On June 15, 2023, the Court held a status conference at which it denied Denton's

8  motion to exclude. Dkt. 247. Defendants then filed the instant motion for summary

9  judgment. Dkt. 248. Defendants argue that they are entitled to qualified immunity and

10  that Denton's claims fail on the merits because their practice of holding him in solitary

11  met constitutional standards. *Id.* Denton argues that Defendants are not entitled to

12  qualified immunity and, even if they are, qualified immunity applies to only money

13  damages, not his claims for declaratory and injunctive relief. Dkt. 259. He further argues

14  that he has presented sufficient facts to survive summary judgment on all three of his

15  claims. *Id.*

16       Denton also moves to strike certain exhibits and parts of a declaration, arguing that

17  they contain hearsay, are conclusory, and are unauthenticated. *Id.* In reply, Defendants

18  move to strike various declarations Denton submitted, arguing that Denton violated the

19  discovery rules and that the declarations are otherwise inadmissible. Dkt. 274.

20       The parties again dispute Denton's detention status. Denton alleges he is being

21  held in Max custody. Dkt. 259 at 7. He also asserts, with supporting documentation, that

22  he was found "not guilty" of the alleged infractions. *Id.* Defendants assert Denton was not

1    placed back on Max custody. Dkt. 274 at 13 n.1. Defendants do not address Denton's

2    assertion that he has been found "not guilty" of the infractions.

3        On August 10, 2023, Denton filed a fourth motion for preliminary injunction. Dkt.

4    282. He asserts that he is currently in the IMU at WSP "even though the infraction that

5    placed him there was dismissed on June 19, 2023." *Id.* at 1.

6                        **III.   DISCUSSION**

7    **A.    Denton's Motion to Strike**

8        **1.    Denton's Motion to Strike the Brannock and Fuelner Exhibits is
     DENIED.**

9

10       Denton moves to strike all the exhibits attached to the declarations of Kitzi

11   Brannock and Timothy Fuelner, arguing that they are hearsay and unauthenticated. Dkt.

12   259 at 7. Defendants argue that the Fuelner exhibits are proper because Exhibits 1–7 are

13   certified copies of court documents, and the remainder were produced in discovery or

14   from DOC's OMNI database. Dkt. 274 at 18–19. They further argue that the Brannock

     exhibits are proper because they are authenticated by her declaration. *Id.* at 19.

15       The court may consider evidence at summary judgment so long as it could be

16   presented in an admissible form at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.

17   2003). "At the summary judgment stage, we do not focus on the admissibility of the

18   evidence's form. We instead focus on the admissibility of its contents." *Id.*

19       The exhibits attached to the Brannock Declaration are DOC disciplinary reports

20   and records. *See* Dkt. 250-1. Those exhibits are self-authenticating as "certified domestic

21   records of a regularly conducted activity." *See* FRE 902(11). The documents are not

22

1    hearsay as they are not offered to prove the truth of the matter asserted. They are instead

2    being offered to show their effect on the reader in evaluating Denton's dangerousness and

3    ability to succeed outside of solitary confinement. Denton's motion is therefore DENIED

4    as to the exhibits attached to the Brannock Declaration.

5         Fuelner's Exhibits 1–7 are state court judgments certified by the court clerk which

6    are self-authenticating under Federal Rule of Evidence 902(4). *See United States v.*

7    *Huffhines*, 967 F.2d 314, 320 (9th Cir. 1992) (admitting copies of judgments certified by

8    the Texas Department of Corrections custodian under FRE 902(4)). The judgments also

9    do not constitute hearsay. Denton's motion to strike Exhibits 1–7 to Fuelner's

10   Declaration is DENIED.

11        Exhibit 8 to the Fuelner Declaration is a collection of some of Denton's DOC

12   mental health records. *See* Dkt. 256. Again, these records are not hearsay; they are not

13   offered to prove the truth of the matter asserted, but rather to show their effect on those

14   assessing Denton's potential for dangerousness. Moreover, they are "statement[s] made

15   for medical diagnosis or treatment" under FRE 803(4) and are therefore excepted from

16   the hearsay rule. The exhibits are also self-authenticating under FRE 902(11). Denton's

17   motion is DENIED as to Exhibit 8 of the Fuelner Declaration.

18        Exhibits 9 and 10 to the Fuelner Declaration are records from DOC's internal

19   OMNI database. These, again, are not used to prove the truth of the matter asserted.

20   Further, Exhibits 9 and 10 are self-authenticating under FRE 902(13). Thus, Denton's

21   motion to strike is DENIED as to Exhibits 9–10 of the Fuelner Declaration.

22

1

**2.      Denton's Motion to Strike Paragraphs 6 and 7 of Gallo Declaration is DENIED.**

2

Denton moves to strike paragraphs 6 and 7 of Charles Gallo's Declaration, arguing

3

they are "conclusionary and based on speculation and hearsay." Dkt. 259 at 7. Defendants

4

argue that the paragraphs are proper because they contain "Gallo's own observations and

5

interactions with Denton." Dkt. 274 at 19.

6

Dr. Gallo is a DOC psychologist employed in the SOU at MCC. Dkt. 252, ¶ 2. He

7

became Denton's primary mental health provider in August 2021. *Id.* ¶ 3. The disputed

8

paragraphs discuss Gallo's assessment of and interaction with Denton in September

9

2021:

10

11

> 6. On or about September 30, 2021, 1 completed a mental health update of
> Mr. Denton. This mental health update was based on my review of his
> extensive mental health records and my conversations with Mr. Denton. A
> true and correct copy of this mental health update is attached to this
> declaration as Exhibit 1. I included my diagnoses of antisocial personality
> disorder and borderline personality disorder in the update. I concluded that
> Mr. Denton's current presentation included manipulation, staff splitting,
> paranoid ideations of him being targeted, reporting thoughts of self-harm
> when not getting his needs med, lack of empathy, and a disregard for other
> people's feelings. I concluded that Mr. Denton did not meet the criteria for
> PTSD and also did not present with symptoms of a psychotic or mood
> disorder.

12

13

14

15

16

17

> 7. I met with Mr. Denton after completing his mental health update and
> informed him that adding SHU syndrome to his treatment plan would not
> be possible since this diagnosis is not recognized by the Diagnostic
> Statistical Manual for Mental Disorders 5'11 edition (DSM-26 5). After this
> discussion I had with Mr. Denton, his professional relationship with me
> significantly changed, Mr. Denton was aggressive and threatening toward
> staff and took the dayroom hostage in one incident. He also was infracted
> because he threatened to physically assault me if he had an opportunity to
> the unit sergeant. I continued to try to work with Mr. Denton; however, Mr.
> Denton would ignore me. Mr. Denton was ultimately discharged from the

18

19

20

21

22

Residential Treatment Unit setting due to his unwillingness to work with mental health.

*Id.* ¶¶ 6–7.

The Court largely agrees that Gallo's statements are based on his own observations and interactions with Denton. Paragraph 6 is simply Gallo's effort to describe and authenticate the report offered as Exhibit 1 to his declaration. Denton does not challenge the report itself. Denton's motion to strike is DENIED as to paragraph 6.

In paragraph 7, Dr. Gallo describes his interactions with Denton and his impression of their relationship. The only statement that could potentially run afoul of the hearsay rule is Gallo's representation that he "informed [Denton] that adding SHU syndrome to his treatment plan would not be possible since this diagnosis is not recognized by the Diagnostic Statistical Manual for Mental Disorders 5'11 edition." *Id.* ¶ 7. This statement is not hearsay, however, because it is not offered to prove the truth of the matter asserted. It is offered, instead, to provide an explanation for the subsequent demise of Dr. Gallo's relationship with Denton. Denton's motion is DENIED as to that statement. Even if offered for the truth of the matter asserted, the evidence could be presented in an admissible form at trial.

The only statement that seems to be without proper foundation is that "Mr. Denton was aggressive and threatening toward staff and took the dayroom hostage in one incident." *Id.* ¶ 7. Gallo seems to be referring to Denton's interactions with other staff members without explaining how he has such knowledge. Nevertheless, the evidence could be presented in an admissible form at trial. For example, a staff member who was

present during these incidents could testify about them. Denton's motion to strike certain paragraphs in Gallo's Declaration is DENIED.

**B.     Defendants' Motions to Strike**

**1.     Defendants' Motion to Strike on the Basis of Discovery Violations is DENIED.**

Defendants argue that Dr. Kupers and Denton have "resisted discovery" and "failed to provide supplemental expert reports before relying upon new opinions" and that Dr. Kupers' testimony should therefore be stricken. Dkt. 274 at 2–3. Similarly, Defendants argue that Denton engaged in discovery violations in relation to the declarations of Kyle Payment, Michael Denton, and Eric Johnsen. *Id.* at 3–6. Denton argues that Defendants have long been aware of these discovery issues and that exclusion is not the proper remedy. Dkt. 278.

The Court agrees. If this case were to continue, to the extent Defendants needed additional discovery due to Denton's alleged discovery violations, they could have filed appropriate motions to reopen discovery, to compel, or otherwise.

Defendants' motion to strike Dr. Kupers' testimony and their motion to strike the declarations of Payment, Denton, and Johnsen are DENIED.

**2.     Defendants' Motion to Strike Declarations as Inadmissible is GRANTED in Part and DENIED in Part.**

Defendants also argue that certain portions of the above declarations should be stricken for containing inadmissible material. Dkt. 274 at 6.

First, Defendants argue that Denton's response improperly relies on Dr. Henry's report, but that Denton never notified Defendants that he intends to call Dr. Henry at trial.

1   *Id.* This request is DENIED. Defendants would have had ample time to resolve this

2   discovery dispute before trial.

3         Second, Defendants argue Payment's Declaration should be stricken because it is

4   irrelevant and because it contains expert opinions from a non-expert witness. *Id.* Parts of

5   Payment's Declaration, Dkt. 264, are relevant to Denton's retaliation claim. Nevertheless,

6   the Court agrees that much of Payment's Declaration is irrelevant. Defendants' motion to

7   strike is GRANTED as to Paragraphs 7–13, 19–22, 24–25 of Payment's declaration, and

8   those paragraphs are STRICKEN. The motion is DENIED as to the remaining

9   paragraphs.

10         Third, Defendants argue that portions of Denton's brief inappropriately rely on Dr.

11   Eusanio's report. Dkt. 274 at 6–7. This issue has been addressed previously. Denton can

12   properly rely on Dr. Eusanio's report to show that Defendants had inquiry notice of how

13   isolation affects his mental health. Further, Dr. Kupers, in forming his opinions, can

14   embrace the opinions of a previous mental health provider. Defendants assert Denton

15   uses the report more broadly but provide no citations supporting that assertion. *Id.* at 7.

16         Further, Defendants argue that "[e]ven if the report were used as some kind of

17   notice, this simply means that Defendants had notice of the contents of the report not that

18   Defendants had notice his opinions were correct." *Id.* They go on to say that "the only

19   notice [the report] provides is notice that Dr. Eusanio had reached certain conclusions

20   about Denton. It cannot provide notice that his conclusions were accurate." *Id.*

21         This assertion is nonsensical. If an inmate had a broken leg and was evaluated by a

22   doctor who told DOC he had a broken leg, DOC could not later escape liability by

1   claiming they were not on notice because they only knew that the doctor concluded he

2   had a broken leg. It is a distinction without a difference. Defendants' motion is DENIED

3   on this point.

4          Fourth, Defendants argue that Johnsen's and Denton's declarations contain

5   statements that are conclusory and amount to hearsay. Dkt. 274 at 7. Defendants take

6   issue with this statement in Johnsen's Declaration: "Dr. Eusanio concluded that Mr.

7   Denton suffered from both mental illness and the effects of long-term isolation, otherwise

8   known as SHU (secure housing unit) Syndrome." Dkt. 263, ¶ 2. Similarly, they take issue

9   with Denton's recitation of his evaluation with and diagnosis by Dr. Eusanio. *See* Dkt.

10  260, ¶¶ 11–13.

11         Regardless of whether these explanations are admissible, the report speaks for

12  itself and is admissible to show notice. Denton may identify that report, as he does at Dkt.

13  260, ¶ 11, and the Court may consider that report in considering whether Defendants

14  were on inquiry notice of the effects of isolation on Denton's mental state. Defendants'

15  motion is DENIED as moot.

16         Finally, Defendants move to strike Denton's explanation of Dr. Kupers'

17  conclusions in his declaration at paragraphs 30 and 31, along with Exhibits G, H, and I to

18  Denton's declaration. As to Dr. Kupers' conclusions, the result is the same as above.

19  Denton can identify Dr. Kupers' report and the report speaks for itself. The Court need

20  not consider Denton's word-for-word quote of the report as it can consider the report

21  itself. To that extent, Defendants' motion is DENIED as moot.

22

1    The Court did not consider Exhibits G, Dkt. 260-7, H, Dkt. 260-8, and I, Dkt. 260-

2    9, in evaluating the underlying summary judgment motion. Thus, Defendants' motion to

3    strike those exhibits is DENIED as moot.

4    **C.    Defendants' Motion for Summary Judgment**

5        **1.    Legal Standard**

6    Summary judgment is proper if the pleadings, the discovery and disclosure

7    materials on file, and any affidavits show that there is "no genuine dispute as to any

8    material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

9    P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence

10   in the light most favorable to the nonmoving party and draw all reasonable inferences in

11   that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986);

12   *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact

13   exists where there is sufficient evidence for a reasonable factfinder to find for the

14   nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence

15   presents a sufficient disagreement to require submission to a jury or whether it is so one-

16   sided that one party must prevail as a matter of law." *Id*. at 251–52.

17   The moving party bears the initial burden of showing that there is no evidence

18   which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*,

19   477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party

20   then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the

21   nonmoving party fails to establish the existence of a genuine issue of material fact, "the

22   moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323–24.

1   There is no requirement that the moving party negate elements of the non-movant's case.

2   *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Once the moving party has met

3   its burden, the non-movant must then produce concrete evidence, without merely relying

4   on allegations in the pleadings, that there remain genuine factual issues. *Anderson*, 477

5   U.S. at 248.

6        **2.    Defendants' Motion for Summary Judgment on Denton's Eighth Amendment Claim is GRANTED.**

7            Defendants argue that Denton's Eighth Amendment claim fails because he cannot

8   show that his confinement in Max custody "presented an objectively serious risk of

9   harm" given that he was able to progress off Max custody and, in fact, did so

10  successfully. Dkt. 248 at 14. They also argue that Denton cannot show that any of the

11  defendants were deliberately indifferent by keeping him in Max custody or by failing to

12  provide him adequate mental health treatment. *Id.* at 15–17. Finally, they argue that, even

13  if Defendants violated Denton's Eighth Amendment rights, they are entitled to qualified

14  immunity because those rights were not clearly established. Dkt. 248 at 20–22.

15  Specifically, they argue that "[i]t is not clearly established that housing inmates, even

16  mentally ill inmates on solitary confinement violates the Eighth Amendment." *Id.* at 20.

17          Denton argues that there are questions of fact as to whether Defendants subjected

18  him to cruel and unusual punishment, precluding summary judgment. Dkt. 259 at 8. He

19  asserts that he objectively had mental health issues that were exacerbated by his time in

20  isolation and that Defendants knew as much. *Id.* at 8–9. Specifically, he cites to Dr.

21  Eusanio's report, which he asserts informed DOC officials that he had SHU syndrome

22

along with other mental health diagnoses. *Id.* at 10. He also asserts that he is not a physical danger to anyone because none of the cited "assaults" involved him physically harming anyone. *Id.* at 9. Finally, he asserts that his mental health issues make it especially difficult to remain "infraction free" and leaving him effectively unable to secure release from solitary. *Id.* at 11.

Denton also argues that he has been denied adequate mental health care. *Id.* at 13–15. He asserts that there is objective evidence that DOC knew about his mental health conditions and that his mental health was being worsened by solitary confinement. *Id.* He argues that DOC denied him adequate care by keeping him in isolation. *Id.* Defendants assert that on 11 occasions between 2017 and 2022, they offered Denton mental health care, and he refused. Denton does not deny this contention and he does not explain why he did not accept the care he claims he needed. Neither he nor his expert explain what treatment he was denied.

As to qualified immunity, Denton challenges the premise of qualified immunity, generally.[6] *Id.* Denton argues that his Eighth Amendment claim is clearly established in case law. *Id.* at 22–23. He further argues that recent non-binding opinions from Justices Breyer and Kennedy, along with myriad scientific evidence, clearly establishes that prolonged solitary confinement is harmful. *Id.* at 24–25.

---

[6] Denton asserts that qualified immunity is based on a misunderstanding of history. Dkt. 259 at 22. Whether the doctrine of qualified immunity should be reevaluated is not for the district court to consider or determine.

1    Under the qualified immunity doctrine, "government officials performing

2    discretionary functions generally are shielded from liability for civil damages insofar as

3    their conduct does not violate clearly established statutory or constitutional rights of

4    which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

5    (1982). Qualified immunity protects officials "who act in ways they reasonably believe to

6    be lawful." *Garcia v. Cnty. of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting

7    *Anderson v. Creighton*, 483 U.S. 640, 641 (1987)). The reasonableness inquiry is

8    objective, evaluating "whether the officers' actions are 'objectively reasonable' in light of

9    the facts and circumstances confronting them, without regard to their underlying intent or

10    motivation." *Graham*, 490 U.S. at 397.

11    A two-part test resolves claims of qualified immunity by determining whether

12    plaintiffs have alleged facts that "make out a violation of a constitutional right," and if so,

13    whether the "right at issue was clearly established at the time of defendant's alleged

14    misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks

15    omitted). Defendants bear the burden to prove they are entitled to qualified immunity.

16    *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

17    The Court may analyze the two qualified immunity questions in either order. *See*

18    *Pearson*, 555 U.S. at 236. In this case, Denton moves for both monetary damages and

19    injunctive relief. Because qualified immunity does not shield Defendants from suit for

20    injunctive relief, it is logical to first address whether Denton has alleged facts that make

21    out a violation of a constitutional right.

22

1       "[T]he Eighth Amendment is violated when prison officials demonstrate deliberate

2 indifference to serious medical needs." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir.

3 2002) (internal quotations omitted). There are both objective and subjective components

4 to determining whether there has been a constitutional violation. *Id.* The objective

5 component requires the plaintiff to show that the defendants subjected the plaintiff to an

6 "objectively intolerable risk of harm." *Farmer*, 511 U.S. at 842. The subjective

7 component requires the plaintiff to show that the defendants "acted with deliberate

8 indifference in doing so." *Hallett*, 296 F.3d at 744 (internal quotations omitted).

9       As to the subjective component, a prison official is deliberately indifferent to a

10 prisoner's serious medical needs when they "deny, delay, or intentionally interfere with

11 medical treatment." *Id.* (internal quotations omitted). Deliberate indifference "entails

12 something more than negligence but is satisfied by something less than acts or omission

13 for the very purpose of causing harm or with knowledge that harm will result." *Gantt v.*

14 *City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

15       Defendants argue that, in evaluating deliberate indifference, the Court "should

16 take into account the legitimate penological interests served by Denton's housing on

17 Maximum Custody." Dkt. 248 at 14 (citing *Griffin v. Gomez*, 741 F.3d 10, 21 (9th Cir.

18 2014)). According to the Ninth Circuit, however, "[t]he precise role of legitimate

19 penological interests is not entirely clear in the context of an Eighth Amendment

20 challenge to conditions of confinement." *Grenning v. Miller-Stout*, 739 F.3d 1235, 1240

21 (9th Cir. 2014). The Ninth Circuit notes in *Grenning* that whether a punishment has a

22

1   legitimate penological interest could factor into the analysis of whether a particular

2   punishment was cruel and unusual. *Id.*

3         Under DOC's current policy, inmates cannot be put into isolation for disciplinary

4   reasons.[7] The justification behind Denton's isolation must be to protect DOC staff and

5   other inmates. It is therefore not clear that the Court can consider whether DOC has a

6   legitimate penological justification for isolating Denton in considering whether its

7   employees were deliberately indifferent to his health needs. In fact, Supreme Court

8   precedent suggests whether there is a legitimate penological justification is irrelevant to

9   the deliberate indifference question. *See Johnson v. California*, 543 U.S. 499, 511 (2005)

10  ("We judge violations of [the Eighth] Amendment under the 'deliberate indifference'

11  standard, rather than *Turner*'s 'reasonably related' [to a legitimate penological interest]

12  standard.").

13        As to whether Defendants were deliberately indifferent to Denton's mental health

14  needs, DOC officials knew that long-term isolation was negatively affecting Denton's

15  mental health. Dr. Eusanio's report makes those effects clear and DOC concedes that it

16  received Dr. Eusanio's report. *See, e.g.*, Dkt. 162, ¶ 14 ("Defendants admit that the

17  Department of Corrections has received a report that purports to be from Dr. Eusanio and

18  that the Department has maintained a copy of that report."). There is, then, a question of

19

20

21        [7] Press Release, Washington State Department of Corrections, *Washington State Department of Corrections Ends Disciplinary Segregation* (updated Oct. 1, 2021),

22  https://www.doc.wa.gov/news/2021/09302021p.htm.

1  fact as to whether Defendants were deliberately indifferent.[8] However, Denton cannot

2  survive summary judgment on the objective component.

3       In assessing the objective component of a deliberate indifference claim, the Ninth

4  Circuit applies a four-part test:

5          (i) the defendant made an intentional decision with respect to the conditions
           under which the plaintiff was confined; (ii) those conditions put the
6          plaintiff at substantial risk of suffering serious harm; (iii) the defendant did
           not take reasonable available measures to abate that risk, even though a
7          reasonable official in the circumstances would have appreciated the high
           degree of risk involved—making the consequences of the defendant's
8          conduct obvious; and (iv) by not taking such measures, the defendant
           caused the plaintiff's injuries.
9
   *Gordon*, 888 F.3d at 1125.
10
11       Defendants made an intentional decision in confining Denton in Max custody, and

12  solitary confinement put him at risk of suffering serious harm. Denton undisputedly

13  struggles with his mental health, and it is well understood that isolation exacerbates

14  mental health problems. Defendants did, however, take reasonable available measures to

15  avoid that risk. The record reflects that Defendants repeatedly tried to work with Denton

16  to secure his release from Max custody. *See generally* Dkt. 248 at 4–13. While it may be

17  true that Denton has struggled to comply with DOC policies because of his mental health

18  struggles, DOC employees actively engaged with him to encourage his compliance and to

19  devise a plan that would help him be successful outside of Max custody. Objectively,

20  Defendants took reasonable measures to abate the risks to Denton's mental health.

21
           [8] Again, this is a close question, based on the Defendants' unrebutted assertion that
22  Denton refused offered mental health care services 11 times in the last five years.

1        Even if Denton had established that Defendants violated his Eighth Amendment

2 rights, Defendants would still be entitled to qualified immunity as to money damages

3 because those rights were not clearly established.

4        Solitary confinement is clearly harmful to individuals' mental health.

5 Nevertheless, that is not the standard for qualified immunity. In fact, it could reasonably

6 be argued that prison itself, even outside the context of solitary confinement, is harmful

7 to individuals' mental and physical health.

8        Defendants cite several cases supporting their assertion that there is no consensus

9 on the unconstitutionality of solitary confinement. *See* Dkt. 248 at 21 (citing, *inter alia*,

10 *Crane v. Utah Dept' of Corr.*, 15 F.4th 1296, 1307 (10th Cir. 2021); *Anderson v. Cnty. of*

11 *Kern*, 45 F.3d 1310, 1316 (9th Cir. 1995). Denton does not raise any compelling case law

12 in response. His main argument is that *Farmer v. Brennan*, 511 U.S. 825 (1994),

13 "established conditions of confinement of an inmate, including being deliberately

14 indifferent to medical and mental health needs violated the Eighth Amendment." Dkt.

15 259 at 23. *Farmer* establishes the "deliberately indifferent" standard but does not clearly

16 establish that solitary confinement violates the Eighth Amendment.

17        Denton also cites non-majority Supreme Court opinions expressing concern with

18 the use of solitary confinement. *Id.* at 24 (citing *Ruiz v. Texas*, 580 U.S. 1191 (2017)

19 (Breyer, J., dissenting); *Glossip v. Gross*, 576 U.S. 863 (2015) (Breyer, J., dissenting);

20 *Davis v. Ayala*, 576 U.S. 257 (2015) (Kennedy, J., concurring)). "[C]losely analogous

21 preexisting case law is not required to show that a right was clearly established."

22 *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). Nevertheless,

1   "[w]here there is no case law directly on point, existing precedent must have placed the

2   statutory or constitutional question beyond debate." *C.B. v. City of Sonora*, 769 F.3d

3   1005, 1026 (9th Cir. 2014) (internal quotation omitted). The non-majority case law

4   Denton cites does not place the Eighth Amendment question "beyond debate." Similarly,

5   scholarly articles about the harmfulness of solitary confinement do not show the law is

6   clearly established.

7       Defendants' motion for summary judgment is therefore GRANTED as to Denton's

8   Eighth Amendment claim and that claim is DISMISSED with prejudice.

9       **3.   Defendants' Motion for Summary Judgment on Denton's Due Process
    Claim is GRANTED.**

10

11      Denton claims Defendants violated his Fourteenth Amendment Due Process rights

    by denying him the "liberty interest of being free from perpetual long-term isolation
12
    without any discernable way for him to free himself." Dkt. 155, ¶ 41. While DOC has a
13
    system by which Denton could, in theory, earn his way out of isolation, Denton claims
14
    the mechanism is not "meaningful" because he is unable to meet the condition of
15
    remaining infraction free because of his mental health conditions. *Id.* ¶ 43.
16

17      Defendants argue that Denton's due process claim fails for two reasons. First, they

    argue that it is barred by res judicata because Denton previously litigated a due process
18
    claim regarding his confinement in Max custody in state court and he could have raised a
19
    due process claim in his 2018 federal lawsuit. Dkt. 248 at 17. Second, they argue that
20
    Denton's due process claim fails on the merits because he cannot show that he was
21
    denied "adequate procedural protections." *Id.* at 17–19. Specifically, Defendants assert
22

1    that DOC's procedures for reviewing an inmate's Max custody status do not violate the

2    Due Process Clause under *Wilkinson v. Austin*, 545 U.S. 209 (2005). *Id.*

3          Denton argues that his claim is not barred by res judicata because, as the Court has

4    previously ruled, res judicata cannot bar a challenge to a continuing course of conduct.

5    Dkt. 259 at 7. Denton further argues that DOC's six-month review standard is "grossly

6    inadequate and does not pass constitutional muster at least with respect to Denton." *Id.* at

7    18. He argues that the reviews are meaningless in Denton's case because he cannot

8    remain infraction free for so long because of his mental illness, which is being

9    exacerbated by his isolation. *Id.* In other words, Denton contends that he finds himself in

10   a Catch-22 situation: he cannot escape solitary because he cannot remain infraction free,

11   and he cannot remain infraction free because he cannot escape solitary.

12         Denton attempts to distinguish *Wilkinson* by explaining that the case involved

13   dangerous gang members who did not claim to have mental illnesses. *Id.* at 15. Denton

14   argues that each case must be analyzed individually using the factors set forth in

15   *Matthews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at 16. While Denton's complaint mainly

16   focuses on his prolonged confinement in isolation, his response to Defendants' motion

17   for summary judgment also discusses his initial placement in Max custody. *Id.* at 17.

18         Finally, Denton argues that he was not given a meaningful opportunity to contest

19   his reassignment to the IMU. *Id.* at 19. He argues this violates the standard set forth by

20   the Ninth Circuit in *Johnson v. Ryan*, 55 F.4th 1167, 1188–89 (9th Cir. 2022). *Id.*

21         Defendants also argue that they are entitled to qualified immunity on Denton's

22   Due Process claim because it is not clearly established that DOC's review process for

1    Max custody inmates violates the Due Process Clause. *Id.* at 21–22. Denton argues that

2    his Due Process claim is clearly established in case law. *Id.* at 22–23.

3            a.    **Denton's Claims are Not Precluded.**

4            The Court previously ruled that res judicata does not bar Denton's claims with

5    respect to his previous federal lawsuits. *See* Dkt. 151. Defendants argue, however, that

6    Denton's Due Process claim is barred by res judicata due to a previous state court ruling.

7    Dkt. 248 at 17. The Washington Court of Appeals ruled that Denton did not "have a

8    protected liberty interest in his classification" of Max custody. *In re Matter of Denton*, 10

9    Wn. App. 2d 1012, 2019 WL 4189280, at *1 (Sept. 4, 2019) (citing *Hernandez v.*

10   *Johnson*, 833 F.2d 1316, 1318 (9th Cir. 1987)). It went on to say that "[h]e only has a

11   liberty interest in change of confinement to intensive management if that change imposes

12   an atypical and significant hardship in relation to the ordinary incidents of prison life"

13   and that "Denton [did] not demonstrate that his conditions of confinement are an atypical

14   hardship." *Id.* at *1–2 (internal quotations and alterations omitted).

15          Res judicata, also known as claim preclusion, does not bar claims based on a

16   continuing course of conduct. *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th

17   Cir. 2000) ("A claim arising after the date of an earlier judgment is not barred, even if it

18   arises out of a continuing course of conduct that provided the basis for the earlier

19   claim."). The Washington Court of Appeals' judgment is dated September 4, 2019, while

20   Denton's operative complaint is dated October 11, 2022. Up to that point, DOC

21   continued to house Denton in isolation. Thus, his claim is not barred by claim preclusion.

22

1    There is a separate question, however, of issue preclusion, also called collateral

2 estoppel.[9] Issue preclusion prevents re-litigation of an issue "when an issue of fact or law

3 is actually litigated and determined by a valid and final judgment, and the determination

4 is essential to the judgment." *Amadeo v. Principal Mutual Life Ins. Co.*, 290 F.3d 1152,

5 1159 (9th Cir. 2002). Issue preclusion applies when the following factors are satisfied:

6 "(1) the issue at stake was identical in both proceedings; (2) the issue was actually

7 litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to

8 litigate the issue; and (4) the issue was necessary to decide the merits." *Janjua v. Neufeld*,

9 933 F.3d 1061, 1065 (9th Cir. 2019) (quoting *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th

10 Cir. 2012), as amended (May 3, 2012)) (looking to the record to determine if an issue had

11 been raised, contested and submitted for determination).

12    As explained further below, whether Denton has a protected liberty interest

13 depends in part on his length of confinement, which has increased substantially since the

14 2019 state court decision. Even if he did not have a protected liberty interest at the time,

15 he could now based on his increased, and nearly continuous, time in isolation. Moreover,

16 the state court ruled that Denton did not have a liberty interest in his classification as Max

17 custody. The question here, while similar, is apparently not the same. Denton argues that

18 he has a liberty interest in avoiding continued placement in, or reentering, solitary

19

20

21        [9] Defendants did not specifically raise issue preclusion, but district courts have the
authority to raise the doctrine sua sponte. *Disimone v. Browner*, 121 F.3d 1262, 1267 (9th Cir.
22 1997).

1    confinement. DOC itself argues that Denton has remained on Max custody but has been

2    out of solitary confinement, even while still classified as a Max custody inmate.

3           Neither claim nor issue preclusion apply to this case.

4           **b.      Defendants are Entitled to Summary Judgment on Denton's Due
     Process Claim.**

5           In analyzing a procedural due process claim, the Court analyzes two issues: (1)

6    "whether the inmate was deprived of a constitutionally protected liberty or property

7    interest"; and (2) "whether that deprivation was accompanied by sufficient procedural

8    protections." *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022). "A liberty interest

9    'may arise from the Constitution itself . . . or it may arise from an expectation or interest

10   created by state laws or policies.'" *Id.* at 1180 (quoting *Wilkinson*, 545 U.S. at 221). The

11   nature of prison conditions may give rise to a liberty interest where those conditions

12   impose "atypical and significant hardship on the inmate in relation to the ordinary

13   incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

14          Inmates do not have a liberty interest in their initial classification. *Myron v.*

15   *Terhune*, 476 F.3d 716, 718 (9th Cir. 2007). Nevertheless, an inmate may have a

16   protected liberty interest in later being moved into restrictive custody if the conditions in

17   restrictive custody are "substantially more restrictive than the general population from

18   which he was moved" or if the conditions impose an "atypical and significant hardship."

19   *Johnson*, 55 F.4th at 1180; *see also Wilkinson*, 545 U.S. at 223–24. While placement in

20   solitary confinement may not automatically give rise to a liberty interest, the length of

21   confinement and frequency of review of confinement status are relevant considerations in

22

1    determining whether the inmate has a liberty interest. *See Brown v. Or. Dep't of*

2    *Corrections*, 751 F.3d 983, 988 (9th Cir. 2014); *see also Hutto v. Finney*, 437 U.S. 678,

3    686 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the

4    confinement meets constitutional standards.").

5         Denton does not challenge his initial classification but rather his lengthy stay in

6    solitary confinement and his reassignments to solitary confinement. The Court concludes

7    that Denton has established that he has been deprived of a protected liberty interest. He

8    has been held in isolation for the vast majority of his incarceration over the past six years.

9    His lengthy term in solitary paired with his serious mental health struggles has made it

10   difficult for him to meet the standards set by DOC for his release from isolation. This

11   imposes an atypical and significant hardship and thus gives rise to a protected liberty

12   interest. DOC has deprived him of that interest by continuing to hold him in isolation.

13        The remaining question is therefore "whether that deprivation was accompanied

14   by sufficient procedural protections." *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir.

15   2022). In analyzing that question, the Court examines the three *Matthews* factors: "(1) the

16   private interest affected; (2) the risk of an erroneous deprivation and the probable value

17   of any additional or substitute procedural safeguards; and (3) the government's interest."

18   *Id.* at 1179–80.

19        As to the first factor, the effects of solitary on Denton are clear and significant. His

20   mental health has declined, and continues to decline, as a result of his isolation. His

21   mental state is also unlikely to improve if he continues to be held in isolation, which may

22   complicate his adjustment outside of prison upon his ultimate release from DOC custody.

1    Despite the significant effects on Denton, the other two *Matthews* factors outweigh

2    his interest and support Defendants' argument that DOC's deprivation of his liberty

3    interest of being free from solitary is accompanied by sufficient procedural protections.

4    As to the second factor, DOC has significant procedural safeguards that make an

5    erroneous deprivation unlikely. DOC's processes allow inmates, including Denton, a

6    meaningful opportunity to secure release from solitary. Within the six month intervals

7    between formal reviews, inmates can progress through the level system and at the highest

8    level they have day room access and contact with other inmates. Contrary to Denton's

9    assertions, inmates do not have to remain completely infraction free to progress through

10   the level system and ultimately obtain release from Max custody. This is clear given the

11   fact that he has progressed through the levels with infractions and succeeded in his

12   placement in the BAR unit. Denton has not described a proposed plan to improve his

13   chances of progressing through these levels. And, as Defendants point out, Denton fails

14   to show how having more frequent reviews of his classification status would lessen the

15   possibility that he is "erroneously" retained on Max Custody. Dkt. 274 at 15.

16   Every six months,[10] DOC reviews the custody status of inmates held in solitary. If

17   the Max custody committee decides to continue to hold an inmate in solitary, that inmate

18   has an opportunity to appeal that decision. Notably, six months is a much shorter length

19

20        [10] Inmates are also apparently subject to an informal sixty-day review. Defendants do not
21   sufficiently explain what this review entails. Moreover, Denton disputes that he is subject to
     sixty-day reviews and there has been some suggestion during this case that not all Max custody
22   inmates are subject to the sixty-day informal review. Because the Court concludes DOC's other
     processes are sufficient, it need not determine the sufficiency of the sixty-day review.

of time than the one-year review upheld by the Supreme Court in *Wilkinson*. While the

Court agrees with Denton that it must evaluate Denton's Due Process claim on its own by

applying the *Matthews* factors, *Wilkinson* suggests that DOC's six-month review is

procedurally sufficient.

As to the third factor, the DOC has a significant interest in confining inmates who

present a danger to staff and other inmates The Court acknowledges that Defendants

failed to produce any evidence that Denton has ever violently assaulted any staff or other

inmates. Nevertheless, Denton's behavior that has resulted in repeated infractions is

serious and concerning. The record reflects that he has assaulted staff by spitting on them

and throwing urine and feces at them. While this type of assault may not be considered as

violent as physically hitting or kicking someone, for example, it remains dangerous to the

health and safety of DOC staff.

Denton also makes serious threats toward DOC staff members. This behavior

continued when he was ultimately released from Max custody earlier this year. DOC does

not have to wait for Denton to follow through on those threats before it takes action to

protect its staff.

While Defendants have deprived Denton of a protected liberty interest by holding

him in isolation for a prolonged period of time, DOC's procedural safeguards are

sufficient to protect Denton's Due Process rights.

Defendants did not violate Denton's due process rights on his Due Process claim

as to money damages. Even Defendants had violated his due process rights, Denton has

1    not met his burden of showing his rights were clearly established, and qualified immunity

2    applies to shield the Defendants from his claim for money damages.

3        Denton cites *Brown v. Oregon Department of Corrections*, 751 F.3d 983 (9th Cir.

4    2014), asserting that it "[e]stablishes the liberty interest not to be indefinitely confined for

5    an extended period of time and certainly not indefinitely without due process." Dkt. 259

6    at 22. *Brown* held that "lengthy confinement without meaningful review may constitute

7    atypical and significant hardship" such that it may give rise to a protectable liberty

8    interest.[11] 751 F.3d at 989. *Brown* does not clearly establish, however, that DOC's

9    practice of granting six-month formal reviews is not "meaningful" or that such practice

10   violates due process.[12]

11       As with Denton's Eighth Amendment claim, he cites to non-majority opinions and

12   academic journal articles to support his assertion that the law in this area is clearly

13   established. *See id.* at 24–25. None of those materials amount to clearly established law.

14       Defendants' motion for summary judgment is GRANTED on Denton's Due

15   Process claim and that claim is DISMISSED with prejudice.

16

17

---

18   [11] In *Brown*, the defendant officials were entitled to qualified immunity because the Ninth
     Circuit determined the liberty interest had not previously been clearly established. 751 F.3d at
19   989.

20   [12] In June of this year, Secretary Strange acknowledged that solitary confinement causes
     "long-lasting harm," and the Department of Corrections announced it was taking steps to reduce
     the use of solitary confinement by 90 percent over the next five years. Press Release,
21   Washington State Department of Corrections, *DOC Pledges to Drastically Reduce Use of
     Solitary Confinement and Announces Closure of Minimum-Security Prison* (June 26, 2023),
22   https://www.doc.wa.gov/news/2023/06262023.htm.

1

2      **4.      Defendants Motion for Summary Judgment on Denton's Retaliation
       Claim is GRANTED.**

3

4          Denton alleges that Defendants retaliated against him for filing grievances and

5      lawsuits by keeping him in solitary confinement in violation of his First Amendment

6      rights. Dkt. 155, ¶¶ 45–48.

7          Defendants argue that Denton's retaliation claim fails for three reasons. First, they

8      argue that keeping an inmate in Max custody is not an adverse action because

9      "maintaining the status quo cannot reasonably be viewed as an adverse action." Dkt. 248

10     at 19. Second, they argue that Denton cannot show he was kept in Max custody because

11     of any protected conduct. *Id.* at 19–20. Third, they argue that "Denton cannot show that

12     his continued retention on Max custody did not reasonably advance legitimate

13     correctional goals." *Id.* at 20.

14         Denton asserts that he has repeatedly and undisputedly engaged in protected

15     conduct by filing both internal grievances and lawsuits. Dkt. 259 at 21. He argues that

16     DOC's treatment of inmate Kyle Payment, who Denton classifies as more dangerous than

17     himself, shows that DOC's explanation of retaining Denton on Max custody because of

18     his alleged dangerousness is pretextual. *Id.* He also asserts that DOC employees bait him

19     into infractions. *Id.*

20         Within the prison context, a First Amendment retaliation claim requires five

21     elements: "(1) An assertion that a state actor took some adverse action against an inmate

22     (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the

1    inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

2    advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th

3    Cir. 2005).

4          The Court agrees that Denton cannot show Defendants kept him in solitary

5    because of his protected conduct. Denton concedes he frequently violates DOC policy

6    and DOC has thoroughly documented Denton's numerous infractions resulting in his

7    continued isolation. Further, Denton cannot show that his continued isolation did not

8    advance a legitimate correctional goal. While it may be true that Denton has not

9    physically harmed anyone during his current incarceration, it is undisputed that he

10   frequently threatens violence and behaves irrationally. That behavior is undoubtedly a

11   manifestation of his struggles with mental health, but that fact does not change the

12   prison's legitimate concern with protecting its staff and other inmates.

13         As to Denton's allegation that DOC employees bait him into infracting, it is

14   unclear how that could factor into his retaliation claim. If true, that evidence would better

15   serve as a reason why Denton has no meaningful opportunity to escape from solitary

16   confinement.

17         Defendants' motion for summary judgment on Denton's retaliation claim is

18   GRANTED and that claim is DISMISSED with prejudice.

19                                        ***

20         This case is difficult for several reasons. It highlights the difficulty of managing

21   inmates with serious mental health issues, particularly those that the prison views as

22   dangerous to other inmates or staff. Solitary confinement is undoubtedly harmful to

inmates' mental health and the practice is especially harmful to inmates who are already suffering from mental health issues. Additionally, inmates, including Denton, will inevitably be released back into the community—the same community this Court seeks to protect in adjudicating criminal matters. Thus, to the extent solitary confinement is worsening their mental health, the practice is potentially putting that community in greater danger. Nevertheless, DOC views solitary confinement, to some extent, as a necessary evil, and the Court owes some deference to that judgment.

While DOC surely understands the complexity of these issues, it frequently understates the severity of Denton's mental health struggles. While Denton has exhibited bad behavior, much of that behavior is a product of his struggles with mental health. By all accounts, Denton experienced an incredibly difficult childhood, and his mental health was in jeopardy from birth as a result of his mother's drug use. This is not to say his transgressions should be excused, but to acknowledge that his behavior is often virtually beyond his control.

These issues are complex and nuanced, and this case is emblematic of why courts are often hesitant to interject themselves into any aspects of prison management.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment, Dkt. 248, is **GRANTED**. Denton's Motion to Strike, Dkt. 259, is **DENIED**. Defendants' Motion to Strike, Dkt. 274, is **GRANTED in part and DENIED in part**. Denton's Motion for Preliminary Injunction, Dkt. 282, is **DENIED as moot**.

The Clerk shall enter a **JUDGMENT** and close the case.

1   Dated this 30th day of August, 2023.

2

3

4   BENJAMIN H. SETTLE
    United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 36